# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

|  |  |  |
|---|---|---|
| WAYNE COBB, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *v.* | ) | |
| | ) | Civil Action No.: <u>2:23-CV-130-RWS</u> |
| JEREMY "BOB" GREEN *and* YOUNG | ) | |
| MEN'S CHRISTIAN ASSOCIATION | ) | |
| OF GEORGIA'S PIEDMONT, INC. | ) | JURY TRIAL DEMANDED |
| | ) | |
| *Defendants*. | ) | |

## **COMPLAINT**

**DEITCH & ROGERS, LLC**
*Gilbert H. Deitch*
Georgia Bar No. 216400
*Andrew T. Rogers*
Georgia Bar No. 007010
*Kara E. Phillips*
Georgia Bar No. 379670
*W. Michael D'Antignac*
Georgia Bar No. 205714

**BONDURANT MIXSON & ELMORE LLP**
*Naveen Ramachandrappa*
Georgia Bar No. 422036
*E. Allen Page*
Georgia Bar No. 640163

**CATHEY & STRAIN, LLC**
*Dennis T. Cathey*
Georgia Bar No. 116600
*Matthew A. Cathey*
Georgia Bar No. 532981

*Attorneys for Plaintiff*

## **INTRODUCTION**

This case addresses years-long offenses of child sexual abuse and sexual predation inflicted upon a child gymnast, Jennifer Cobb, by someone entrusted with her safety and well-being—a coach and employee of the YMCA. Despite knowing of prior instances of inappropriate encounters with young girls, the YMCA allowed Coach Jeremy "Bob" Green to continue coaching Jennifer and her teammates and even to spend the night with her at lock-ins.

Jennifer was a bright and lively 11-year-old who discovered a natural talent when she joined the "Twisters" gymnastics squad. Coach Bob was a 27-year-old man who began grooming Jennifer almost immediately. That grooming, coupled with the YMCA's persistent indifference to the consequences, paved the way for the sexual abuse that destroyed Jennifer's childhood, her will, and eventually her life.

Green first raped Jennifer when she was 14. Because of the insidious effect of the grooming, Jennifer didn't understand she was a victim; she believed she loved Green. When family members reported inappropriate encounters to the police, Green secretly convinced Jennifer to lie to thwart any investigation.

Yet despite Jennifer's inability to see it for what it was, the devastation of her abuse was manifesting itself in self-destructive behaviors. She constantly pulled out her own hair—a condition called trichotillomania—so that she eventually needed a wig. She cut herself. Her personality changed, and she distanced herself from her

friends and family. When she turned 18, already a shell of her former self, Jennifer abandoned her parents and beloved pet to move in with Green. Only then—after Jennifer's parents no longer had standing to bring a claim on her behalf—did anyone at the YMCA tell her parents that they knew of Green's inappropriate behavior.

It wasn't until several years later, when Jennifer discovered inappropriate text messages between Green and a different minor girl, that she realized the truth for herself: that she was a victim, and she had been all along. She finally left Green, returned to her family, and met with a therapist to begin processing her trauma. She also met with a GBI agent for a forensic interview.

After her interview, Bob Green was arrested. At the bond hearing, the prosecutor asked the court to deny bond, in part to protect Jennifer's safety. After character witnesses spoke up about Green's "integrity," including a pastor who claimed he had discussed potential marital counseling between Green and Jennifer, Jennifer herself testified that, if Green were allowed out on bond, she worried for the other children he might endanger. Yet, notwithstanding Jennifer's testimony, the judge allowed Green out on bond.

It had been the first time that Jennifer was able to speak out against Green. It was also, tragically, the last. Six days after the hearing, on June 30, 2021, Jennifer's body was found hanging in her shower. She was twenty years old.

## PARTIES

1.

Plaintiff WAYNE COBB files this Complaint on behalf of his deceased daughter Jennifer Cobb for her personal injuries. *See, e.g.*, *Glickstein v. Sun Bank/Miami, N.A.*, 922 F.2d 666 (11th Cir. 1991).

2.

Defendant JEREMY "BOB" GREEN is citizen of Georgia and a resident of Hart County, Georgia. Defendant Green can be served at 973 Airline School Road, Bowersville, Hart County, Georgia 30516. At all times relevant to this Complaint, Green was over the age of majority under Georgia law.

3.

Defendant YOUNG MEN'S CHRISTIAN ASSOCIATION OF GEORGIA'S PIEDMONT, INC ("YMCA Piedmont") is a Georgia non-profit corporation with its headquarters at 50 Brad Akins Drive, Winder, Georgia 30680. Defendant YMCA Piedmont may be served via its registered agent, Angie Putman, at 50 Brad Akins Drive, Winder, Georgia 30680. YMCA Piedmont operates the Bell Family YMCA (the "Bell Family Branch"), located at 281 Opal Street Extension, Hartwell, Georgia 30643. Unless otherwise noted, all references to YMCA Piedmont refer to the Bell Family Branch.

## JURISDICTION AND VENUE

### 4.

This Court has jurisdiction over federal claims under 28 U.S.C. § 1331.

### 5.

This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the federal and state law claims arise from a common nucleus of operative facts and thus constitute the same case or controversy. *See, e.g., J.D. v. Zirus*, 2012 WL 787054 (W.D. Tex. Mar. 6, 2012).

### 6.

Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b)(1) and (c) because all Defendants reside in the state of Georgia, and Defendant YMCA Piedmont resides in Barrow County, located in this district.

### 7.

Venue is proper in the Gainesville Division pursuant to Local Rule 3.1(B)(1)(b) because the Defendants reside in different districts, and Defendant YMCA Piedmont resides in Barrow County, located in this division.

## FACTUAL BACKGROUND

### 8.

The Bell Family YMCA was founded in 1994 and located in Hartwell, Georgia. YMCA Piedmont was founded in 1996 and is located in Winder, Georgia. In 2007, the two merged, leaving YMCA Piedmont as the successor entity, which operates the Bell Family location as one of its branches.

### 9.

YMCA Piedmont proclaims that its mission is "[t]o put Christian principles into practice through programs that build health, spirit, mind, and body for all."

### 10.

YMCA Piedmont promises "[a] staff that is well trained, caring and available to serve you" as well as "[e]xceptional program quality" and [o]ur volunteers, staff, and members are committed to creating an environment at our YMCA where 'God and a good time are friends.'"

### 11.

YMCA Piedmont represents to the public in general and parents of prospective child participants in particular that YMCA Piedmont "offers a variety of youth sports throughout the year to give children the opportunity to reach their potential. We focus on fundamentals, teamwork and sportsmanship in all of our sports. The YMCA works with volunteer coaches and staff to create quality sports

programs so that every child can enjoy and thrive. The YMCA is here for youth development!"

12.

Specific to the YMCA Piedmont's gymnastics program, YMCA Piedmont represents to the public, and, in particular, parents of prospective child participants, that YMCA Piedmont "strive[s] to provide the best gymnastics program" and is a place where children can "[d]evelop self-confidence and team building." YMCA Piedmont knows that parents entrust the safety, welfare, and over-all well-being of their children to YMCA Piedmont's administration, staff, and coaches while their children participate in the gymnastics program and gymnastics team.

**Jennifer Joins the Twisters Gymnastics Program**

13.

For all times relevant, YMCA Piedmont operated a junior girls gymnastics team called the "Twisters." The Twisters gymnasts were managed by a head coach, assistant coaches, and high-school students who acted as junior coaches.

14.

From on or before 2007 to 2013, Defendant Bob Green was an employee, representative, and agent of YMCA Piedmont and served as an assistant coach for the Twisters.

15.

As an assistant coach, Green supervised and interacted hands-on with gymnasts as young as three years old and as old as the 15–16-year-old "junior coaches." In this role, Green was directly responsible for overseeing the overall instruction and safety of children participants in the gymnastics program. By the nature of his employment as a gymnastics coach, Green regularly touched, grabbed, and held the gymnasts, including the girls.

16.

Bob Green stood out for being the only male coach at the time and for his long, dreadlocked hair.

17.

In or around Fall 2012, at age 11, Jennifer Cobb joined the Twisters. At the time, Jennifer was beloved by friends and family alike. She quickly established herself as one of the most talented gymnasts in her age cohort.

18.

During her first months with the Twisters, Jennifer regularly interacted with Green as an assistant coach. Because Jennifer was particularly talented, coaches, including Green, often dedicated extra attention to her.

19.

In or around March 2013, Green suddenly quit his job at the Twisters. He told the Twisters coaches and gymnasts that he was joining the Army. The young Twisters gymnasts were sad that Coach Bob was leaving. Jennifer Cobb in particular was visibly devastated. Before Green left, he had cut his long hair.

20.

From on or about 2013 to 2015, though a former YMCA Piedmont employee, Green continued to attend Twisters events at the invitation and with the knowledge of YMCA Piedmont.

**Defendant Green's Grooming and Abuse at YMCA Piedmont Events**

21.

After Jennifer Cobb joined the Twisters, through the extensive, unfettered access to Jennifer provided by YMCA Piedmont, Green began "grooming" her by expressly portraying himself as safe, caring, and loving while simultaneously engaging in verbal and physical exchanges that were increasingly sexualized.

22.

At the same time, Green positioned himself as a trusted coach and friend of the Cobb family, including Jennifer's parents Susan and Wayne Cobb.

23.

On or around December 29, 2012, YMCA Piedmont hosted the Twisters for an overnight "lock-in" party. Jennifer was one of the attendees, and Green was a supervisor. As part of the event, the Twisters traveled from Hartwell, Georgia, to Anderson, South Carolina, for dinner then returned to the Bell Family Branch for the lock-in.

24.

At the lock-in, during a game of hide and seek, Green and Jennifer were missing for hours late into the night and early hours of the morning, ostensibly hiding together. In fact, they were under the bleachers, where Green was kissing and fondling Jennifer.

25.

During the lock-in, in addition to noting Green's and Jennifer's long absence, other YMCA Piedmont coaches observed inappropriate hugging and kissing between Green and Jennifer. One junior coach found them lying inappropriately together under a mat in a foam pit and told an assistant coach.

26.

Over the next several months until his departure from the YMCA, Green continued his grooming of Jennifer Cobb by engaging in verbal and physical

exchanges that were increasingly sexualized at YMCA Piedmont Twisters events where he had unsupervised access to her.

27.

On or around July 17, 2013, YMCA Piedmont hosted the Twisters at another overnight "lock-in" at the Bell Family Branch. Jennifer was then 12 years old. Though he was no longer employed as a coach, Green, who was 28 years old at the time, returned to attend the event on invitation from the head Twisters coach, Tara Bowers, an employee and agent of YMCA Piedmont.

28.

Again, during the lock-in, Green and Jennifer were missing for three or more hours, ostensibly hiding together. During that time Green lured Jennifer into a single-stall bathroom alone. Jennifer used the bathroom and Green asked to wipe her genitals, but Jennifer avoided allowing him. Green tried to get another YMCA Twister gymnast to come into the bathroom with the two of them as well. Green then moved Jennifer into another bathroom and pinned her against the wall, kissing and fondling her. Green told Jennifer to stop because "you're making me want to do things I shouldn't."

29.

During the lock-in, in addition to noting Green's and Jennifer's lengthy absence together, other YMCA Piedmont coaches observed inappropriate hugging and kissing between Green and Jennifer.

**Defendant Green's Subsequent Grooming, Abuse, and Obstruction**

30.

In the years after the YMCA Piedmont events, from 2013 to 2018, having groomed Jennifer Cobb through the extensive, unfettered access provided by YMCA Piedmont, Green continued his grooming and sexual abuse of Jennifer. Jennifer was 12–17 years old during this period. Green was 28–33 years old.

31.

During this period, Green also initiated and maintained daily communication with Jennifer via telephone and messaging apps to persuade, induce, entice, and coerce her to engage in sexual activity, including soliciting sexual images from Jennifer and sending sexual images to Jennifer.

32.

During this period, Green used his manipulation and influence over Jennifer to induce her to destroy her cell phones and other evidence of his sexual activity and to conceal their relationship from her parents and friends.

33.

At some point in 2013, when Jennifer was 12 years old and Green was 28 years old, Green also began to engage in sexual acts such as placing his mouth on Jennifer's genitals and asking her to place her mouth on his genitals.

34.

On or about July 24, 2015, when Jennifer was 14 years old and Green was 30 years old, Green returned from Fort Bragg in North Carolina, to Hartwell, Georgia, to engage in sexual activity. Green used his manipulation and influence over Jennifer to lure her from her home. He took her to a field nearby and raped her.

35.

Thereafter, upon information and belief, each time Green returned to Hartwell, Georgia, from on leave from Fort Bragg, he raped Jennifer.

36.

On or about November 24, 2015, Green used his manipulation and influence over Jennifer and her parents to be alone with Jennifer in the Cobb family's living room. There, Green digitally penetrated Jennifer's vagina with his fingers.

37.

Jennifer's brother Austin Cobb walked in on and saw the assault. Austin told his parents, who reported Green to the police.

38.

Green used his manipulation and influence over Jennifer to persuade her to lie to the Hart County Sheriff's Office and the Harmony House forensic interviewer. Before the interview, Green forced Jennifer to practice lying about the sexual abuse. His purpose was to obstruct and ultimately thwart the criminal investigation. He was successful, and he was not prosecuted at the time.

39.

On June 20, 2018, Green again used his manipulation and influence over Jennifer to lure Jennifer Cobb from her parents' home and raped her.

40.

At that time, unable to find or contact Jennifer for hours, her parents reported her as missing to the police. Again, Green used his influence and manipulation over Jennifer to induce her to not report to her parents that she was with Green or that he had continued his years of sexual abuse.

41.

On September 7, 2018, Jennifer's father found Jennifer at the Hartwell Dollar General with Green. Her parents again reported the 33-year-old Green's inappropriate sexual interest in their 17-year-old daughter.

42.

Throughout the entire course of his inappropriate relationship with Jennifer, Green never told Jennifer that his conduct was illegal or otherwise improper.

43.

Because of Green's conduct and Jennifer's compromised capacity, she was not in a position to discover the inappropriate and illegal nature of Green's conduct.

**Defendant YMCA Piedmont's Misrepresentations, Knowledge, and Inaction**

44.

Prior to, during, and after Green's sexual abuse of Jennifer, YMCA Piedmont affirmatively conveyed, and has continued to convey, to children and families various express representations about safety through explicit language, publications, and literature. Those representations include, but not are limited to, its mission "[t]o put Christian principles into practice through programs that build health, spirit, mind, and body for all" and statements that YMCA Piedmont provides "[a] staff that is well trained, caring and available to serve you" as well as "[e]xceptional program quality" and that "[o]ur volunteers, staff, and members are committed to creating an environment at our YMCA where 'God and a good time are friends.'"

45.

YMCA Piedmont, through its employees, coaches, and agents, established a relationship of confidence with its students by representing that it would undertake their physical, moral, and spiritual development through its programs.

46.

Despite its affirmative representations of safety, and despite establishing a relationship of confidence with its participant gymnasts, and despite hosting innumerable programs for children of many ages, YMCA Piedmont in fact had no policies or programs in place to prevent child sex abuse by its employees, coaches, or other supervisors. YMCA Piedmont never provided any training for any of the Twisters coaches, many of whom were young adults themselves, concerning how to recognize, identify, investigate, respond to, report, or prevent child sex abuse.

47.

Upon information and belief, starting in or around 2007-2008, YMCA Piedmont knew or should have known that Green was likely to abuse his position of power and sexually assault girls. During that time, Green had one or more inappropriate relationships with gymnasts and other minor girls through his work as a staff member and coach at YMCA Piedmont.

48.

Despite this knowledge, YMCA Piedmont did nothing to restrict or prevent Green from interacting with the Twisters gymnasts.

49.

Pursuant to carrying out YMCA Piedmont's stated mission and as part of his responsibilities as a gymnastics coach and authority figure at YMCA Piedmont, Green befriended Jennifer and gained her trust.

50.

Over the course of Jennifer's involvement with the Twisters, Green took specific steps to gain her trust, including increasing one-on-one training time and purporting to develop her talent for gymnastics, all of which were for the purpose of facilitating an inappropriate, personal relationship with her.

51.

Because of Jennifer's talent as a gymnast, other coaches ignored and even encouraged the unusual amount of Green's one-on-one training time with Jennifer as well as his attempts to facilitate an inappropriate personal relationship with her.

52.

Because of Green's role as the sole male coach of the Twisters, other YMCA Piedmont coaches held him out as being especially safe for the gymnasts, both in terms of his ability to train and hold them during gymnastics stunts, and to serve as

potential protection during overnight lock-in events. In particular, the Twisters coaches told Jennifer and her parents that they did not need to worry about Jennifer at the lock-ins, and that they would lock the doors and keep the children safe. The coaches further believed and communicated that having Green, a male, present at the lock-ins meant the gymnasts would be even more safe.

53.

During YMCA Piedmont events where Green was present, YMCA Piedmont coaches and employees encouraged the Twisters to participate in "girl talk" and prayer time so as to facilitate an environment of confidence, trust, openness, and honesty.

54.

As a result of the representations made by YMCA Piedmont, of Green's actions as a gymnastics coach and authority figure at YMCA Piedmont, and of the acquiescence and encouragement of other coaches, Jennifer was conditioned to trust Green, comply with his directions, and abide by his authority concerning ethical, moral, and religious issues as well as appropriate parameters of physical and emotional conduct.

55.

In or around 2012 and 2013, YMCA Piedmont, by way of its employees and agents, knew that Green had been behaving inappropriately with Jennifer Cobb at YMCA-sponsored "lock-ins," as discussed above.

56.

Despite its knowledge, YMCA Piedmont did not take any action, including failing to notify Jennifer's parents, failing to notify any authorities, and failing to conduct any further investigation into Green's abuse of Jennifer or other gymnasts.

57.

Despite its knowledge, YMCA Piedmont continued to give Green unfettered access to Jennifer, which he used to groom and sexually abuse her during and after his employment as a coach.

58.

Upon information and belief, to this day, YMCA Piedmont has done nothing to address the abuse suffered by Jennifer.

59.

Upon information and belief, to this day, YMCA Piedmont did not by its statutory obligations to report abuse allegations to appropriate authorities.

60.

To this day, YMCA Piedmont did not publicly acknowledge its knowledge and failures to expose Green as the abuser and pedophile.

61.

To this day, YMCA Piedmont has actively concealed its knowledge that Green had been accused of childhood sexual abuse prior to Cobb's abuse, and thereafter.

62.

It was not until after Jennifer turned 18 and moved out of her parents' home that anyone at YMCA Piedmont discussed their knowledge of concerns over Green's inappropriate behavior with Jennifer. By that time, Jennifer's parents no longer had standing to bring a claim on her behalf, yet Jennifer's ability and capacity to make decisions for herself remained compromised.

63.

Upon information and belief, no one from YMCA Piedmont ever told Jennifer about its knowledge of Green's inappropriate behavior.

64.

No one from YMCA Piedmont ever told Jennifer that YMCA Piedmont had acted inappropriately or illegally toward her.

65.

Because of YMCA Piedmont's conduct and her compromised capacity, Jennifer was unable to discover the inappropriate and illegal nature of YMCA Piedmont's conduct.

**Jennifer's Injuries**

66.

As a result of the sexual grooming and abuse by Defendant Green, Jennifer suffered devastating physical, psychological, and emotional injuries as well as an extreme loss of the enjoyment of life through social isolation, all of which culminated in her untimely death.

67.

On and prior to 2013 through her 18th birthday in 2019, Jennifer suffered from trichotillomania, a condition of self-harm whereby she repeatedly pulled out her own hair. She did not initially tell her parents or doctors that she pulled her own hair, leading them to mistakenly believe she suffered from alopecia. As a result of the extensive hair loss, she regularly wore a wig.

68.

In addition to pulling her own hair, and unbeknownst to her parents and doctors, Jennifer regularly engaged in self-harm by cutting herself.

69.

In addition to self-harm, Jennifer suffered extreme social isolation. Green was possessive and controlling of her every move and did not allow her to play with her friends like a normal child, pre-teen, and teenager.

70.

In 2018, when she was 17 years-old, the Cobb family began family therapy with Dr. Beverly Oxley at Wellsprings Psychological Resources. Due to Green's grooming, Jennifer refused to meaningfully participate in that and subsequent sessions. Dr. Oxley observed Jennifer during that period of time including her depression, lack of motivation, self-harming, and other symptoms of the havoc resulting from the manipulation, influence, and sexual abuse by Green.

71.

On January 18, 2019, when Jennifer turned 18-years old, she left her home and moved in with Green.

72.

Though Jennifer had attained the age of majority, her will continued to be dominated and overborne by Green's years of and continued grooming and influence, which impaired her capacity to make ordinary decisions for herself.

73.

As a result of Green's grooming and domination of her will, Jennifer was separated from loved ones, including family, friends, and her beloved pet.

### Jennifer's Realization & Green's Prosecution

74.

Throughout the time she was being abused and then living with Green, Jennifer was incapable of processing her experience, as is common with victims of sexual abuse, especially children.

75.

In or around September 2020, Jennifer found text messages between Green and another minor female he was actively grooming, which caused her to belatedly recognize that she herself was a victim of Green's grooming and abuse.

76.

In or around September 2020, Jennifer left Green.

77.

On May 6, 2021, Jennifer returned to Dr. Oxley for therapy but this time for the express purpose of receiving diagnosis, treatment, and begin processing the trauma caused by Green at the Bell Family YMCA and thereafter. Dr. Oxley

diagnosed her with Acute Post-Traumatic Stress Disorder due to the trauma of the childhood sexual abuse.

78.

Dr. Oxley subsequently met with Jennifer on May 13, 2021, and May 18, 2021, to discuss the timeline of her abuse. During these sessions, Jennifer expressly waived her privilege related to her communications with Dr. Oxley to facilitate protection of other children subject to the danger of Green and other pedophiles similarly situated in positions by organizations like YMCA Piedmont.

79.

On June 14, 2021, Jennifer met with Agent Katie Walker with the Georgia Bureau of Investigation for an interview about Green.

80.

The next day, on June 15, 2021, Green was arrested.

81.

On June 24, 2021, the court conducted a bond hearing. At the hearing, the prosecution asked the court to deny bond in part because Green could be a danger to Jennifer. The defense called two character witnesses who testified about Green's "integrity," despite having at least some knowledge of his conduct with Jennifer. One, who claimed to be a pastor at Green's church, noted that he had talked to Green about possible marriage counseling concerning Green and Jennifer.

82.

After the defense witnesses testified, Jennifer testified about witnessing Green's conduct around other minors. She testified that she worried he would be a danger to others if he were allowed to be free.

83.

During her testimony, the judge asked, "You're not saying this because you['re] jealous, right?" Notwithstanding Jennifer's testimony and the prosecution's request, the judge then ruled that Green would be allowed to post a bond and be released from custody.

84.

On June 30, 2021, less than a week later, Jennifer Cobb's body was found hanging in her shower, and she was pronounced dead.

85.

On or around August 24, 2021, a Hart County Grand Jury indicted Green on six-counts of statutory rape and child molestation. Upon information and belief, as of the date of this Complaint, Green's prosecution remains pending.

## CLAIMS

86.

The factual allegations contained in the previous paragraphs are hereby incorporated into the claims below.

## COUNT I
## CHILD SEX ABUSE UNDER MARSHA'S LAW – 18 U.S.C. § 2255
### (*Against Defendant Green*)

87.

Marsha's Law permits a minor victim of sex abuse to recover damages when certain criteria are met, as is the case here. *See* 18 U.S.C. § 2255.

88.

On numerous occasions between 2012 and 2018, Defendant Green used a cell phone and internet-based apps to make calls and send texts and other messages to knowingly persuade, induce, entice, and / or coerce Jennifer Cobb, a minor child, to engage in sexual activity. *See* 18 U.S.C. § 2422 (b).

89.

On numerous occasions between 2012 and 2018, Defendant Green knowingly crossed state lines for the purpose of engaging in illegal sexual conduct with Jennifer Cobb, a minor child. *See* 18 U.S.C. § 2423 (b).

90.

Upon information and belief, on numerous occasions between 2012 and 2018, Defendant Green used cell phone calls and text messages, and internet-based apps to knowingly use, persuaded, induced, enticed, or coerced Jennifer Cobb, a minor child, to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, including transmission of said illegal child pornography across state lines. *See* 18 U.S.C. §§ 2251 (a), 2252A (a)(2).

91.

As a result of the above-described conduct, Jennifer Cobb suffered irreparable and ongoing harm including but not limited to physical injuries, extreme mental and emotional distress, physical manifestations of mental and emotional distress, humiliation, anguish, loss of self-esteem, disgrace, as well as economic losses, in amounts to be proven at trial.

92.

The illegal coercion and enticement perpetrated against Jennifer Cobb by Defendant Green violated Marsha's Law. Defendant Green is therefore liable for his violations.

## COUNT II
## CHILD SEX ABUSE UNDER GEORGIA LAW
### (*Against Defendant Green*)

93.

On numerous occasions between 2012 and 2018, Defendant Green engaged in illegal sexual conduct and contact with Jennifer Cobb, a minor victim.

94.

The illegal sexual conduct included, but was not limited to, rape, sodomy, statutory rape, child molestation, enticing a child for indecent purposes, solicitation of sodomy, and sexual battery under Georgia law.

95.

These acts constitute childhood sexual abuse as defined in Georgia law. *See* O.C.G.A. § 9-3-33.1.

96.

As a result of the above-described conduct, Jennifer Cobb suffered irreparable and ongoing harm including but not limited to physical injuries, extreme mental and emotional distress, physical manifestations of mental and emotional distress, humiliation, anguish, loss of self-esteem, disgrace, as well as economic losses, in amounts to be proven at trial.

97.

The conduct perpetrated against Jennifer Cobb by Defendant Green was tortious under Georgia law. Therefore, Defendant Green is liable for his conduct.

## COUNT III
## NEGLIGENT FAILURE TO WARN
### *(Against Defendant YMCA Piedmont)*

98.

Defendant YMCA Piedmont owed a duty to provide adequate warning to Jennifer Cobb and her parents after YMCA Piedmont knew or should have known of Defendant Green's propensity for committing childhood sexual abuse.

99.

Defendant YMCA Piedmont breached the duty owed to Jennifer Cobb and other students by failing to warn Jennifer, Jennifer's family, and others of Green's dangerous and exploitative propensities.

100.

As a result of the above-described conduct, Jennifer Cobb suffered irreparable and ongoing harm, including but not limited to physical injuries, extreme mental and emotional distress, physical manifestations of mental and emotional distress, humiliation, anguish, loss of self-esteem, disgrace, as well as economic losses, in amounts to be proven at trial. This damage arose not only from the abuse itself but

also from Defendants' acts of misrepresentation to and concealment from Jennifer Cobb during her lifetime, and her parents during Jennifer Cobb's childhood.

## COUNT IV
## NEGLIGENT HIRING, RETENTION, AND SUPERVISION
### *(Against Defendant YMCA Piedmont)*

101.

At all relevant times, Defendant YMCA Piedmont owed a duty of reasonable care to protect the YMCA Twisters participants, including Jennifer Cobb, at the Bell Family Branch and during all YMCA Piedmont-sponsored activities.

102.

At all relevant times, Defendant YMCA Piedmont owed a duty of reasonable care to ensure that its employees, coaches, and agents were capable of protecting the YMCA Twisters participants, including Jennifer Cobb, at the Bell Family Branch and during all YMCA Piedmont-sponsored activities.

103.

At all relevant times, Defendant YMCA Piedmont owed to the YMCA Twisters participants, including Jennifer Cobb, a duty of ordinary care to institute necessary policies, procedures, training, oversight, and monitoring of YMCA Twisters activities to protect the minor children entrusted to Defendant YMCA Piedmont.

104.

At all relevant times, Defendant YMCA Piedmont beached these duties and was negligent or grossly negligent by, among other things:

- hiring and retaining Bob Green despite knowing of his inappropriate behavior toward minors;

- hiring and retaining other employees, staff, coaches, and other agents who were not qualified and suitable for employment as coaches and childcare providers;

- failing to establish sufficient policies and procedures designed to prevent child sexual abuse;

- failing to follow and adhere to applicable policies and procedures designed to prevent child sexual abuse;

- failing to follow and adhere to applicable rules and regulations designed to prevent child sexual abuse;

- inadequately training its employees, staff, coaches, and other agents;

- inadequately supervising its employees, staff, coaches, and other agents;

- inadequately addressing discipline and/or termination of certain its employees, staff, coaches, and other agents;

- inadequately supervising Jennifer Cobb;

- inadequately monitoring the supervision of Jennifer Cobb;

- authorizing its employees, staff, coaches, other agents, and invitees to have unsupervised and unrestricted access to Jennifer Cobb and to have the opportunity to groom, mistreat, and sexually abuse her; and

- failing to report instances of inappropriate or illegal behavior committed by members of YMCA Piedmont's staff or committed on YMCA Piedmont's premises.

105.

As a result of the above-described conduct, Jennifer Cobb suffered irreparable and ongoing harm, including but not limited to physical injuries, extreme mental and emotional distress, physical manifestations of mental and emotional distress, humiliation, anguish, loss of self-esteem, disgrace, as well as economic losses, in amounts to be proven at trial. This damage arose not only from the abuse itself but also from Defendants acts of misrepresentation to and concealment from Jennifer Cobb during her lifetime, and her parents during Jennifer Cobb's childhood.

## COUNT V
## PREMISES LIABILITY
### *(Against Defendant YMCA Piedmont)*

106.

At all relevant times, Defendant YMCA Piedmont had supervisory control over employees, staff, coaches, invitees, and others at the Bell Family Branch.

107.

At all relevant times, as part of Defendant YMCA Piedmont's duties and responsibilities, Defendant YMCA Piedmont was aware of, and had reasonable opportunity to be aware of, the frequency and types of activities occurring at the Bell Family Branch.

108.

At all relevant times, Defendant YMCA Piedmont's duties and responsibilities, Defendant YMCA Piedmont was aware of, and had reasonable opportunity to be aware of, the various risks of harm to children in its care, including the risk of sexual abuse by Defendant YMCA Piedmont's employees, staff, coaches, invitees, and others in charge of supervising the children at the Bell Family Branch.

109.

At all relevant times, Defendant YMCA Piedmont had authority and discretion regarding whether and how to take certain measures to provide for the safety of invitees at the Bell Family Branch, including the children in its care.

110.

At all relevant times, Defendant YMCA Piedmont owed its invitees, including the children in its care, the duty to protect them from dangerous and inappropriate acts at the Bell Family Branch, including sexual abuse and assault.

111.

At all relevant times, Jennifer Cobb was an invitee at the Bell Family Branch and under the care of Defendant YMCA Piedmont.

112.

At all relevant times, Jennifer Cobb's parents paid Defendant YMCA Piedmont to provide gymnastic instruction and supervision for their minor child.

113.

At all relevant times, as a result of Defendant YMCA Piedmont's negligence and gross negligence, Jennifer Cobb was groomed, sexually abused, sexually assaulted, and sodomized at the Bell Family Branch by a member of Defendant YMCA Piedmont's staff, Defendant Green.

114.

As a direct and proximate result of Defendant YMCA Piedmont's negligence and gross negligence and the negligence and gross negligence of Defendant YMCA Piedmont's employees or agents for which YMCA Piedmont is vicariously liable, Jennifer Cobb was abused by Defendant Green.

115.

As a result of the above-described conduct, Jennifer Cobb suffered irreparable and ongoing harm including but not limited to physical injuries, extreme mental and emotional distress, physical manifestations of mental and emotional distress, humiliation, anguish, loss of self-esteem, disgrace, as well as economic losses, in amounts to be proven at trial.

## COUNT VI
## BREACH OF FIDUCIARY DUTY
### *(Against All Defendants)*

116.

Defendants acted as caregivers toward Jennifer Cobb, a minor, while supervising her away from her parents.

117.

Defendants exercised a controlling influence over the will, conduct, and interest of Jennifer Cobb, a minor.

118.

Defendants represented YMCA Piedmont to be an organization consisting of safe and morally upstanding adult coaches and invitees who were like a family and who safely supervised children under their care.

119.

Defendants therefore established a special relationship of trust with Jennifer Cobb, a minor, and had a fiduciary duty to exercise the utmost good faith in safeguarding her from known dangers.

120.

Defendants breached that duty by failing to provide for Jennifer Cobb's health, safety, and well-being, exposing her to a sexual predator, fostering an environment of inappropriate coach-student emotional and physical contact, and mispresenting and concealing the known dangers posed by Defendant Green at YMCA Piedmont-sponsored events and activities and in general.

121.

As a result of the above-described conduct, Jennifer Cobb suffered irreparable and ongoing harm including but not limited to physical injuries, extreme mental and emotional distress, physical manifestations of mental and emotional distress, humiliation, anguish, loss of self-esteem, disgrace, as well as economic losses, in amounts to be proven at trial.

## COUNT VII
## PUNITIVE DAMAGES
### *(Against All Defendants)*

122.

Defendants' knowing and intentional conduct warrants punitive damages to be determined by the enlightened conscience of a jury.

123.

Defendants' actions demonstrate an entire want of care that raises the presumption of conscious indifference to the consequences of such actions.

124.

Punitive damages should be imposed on the Defendants in an amount to be determined at trial.

## COUNT VIII
## ATTORNEYS FEES AND EXPENSES OF LITIGATION
### *(Against All Defendants)*

125.

Defendants' actions constitute willful, intentional, and tortious conduct. Every intentional tort involves an element of bad faith that entitles a person to recover the expenses of litigation, including attorney's fees.

126.

The actions of Defendants and their agents and representatives have caused Plaintiff unnecessary trouble and expense.

127.

Plaintiff is entitled to recover his attorneys' fees and the expense of litigation from the Defendants.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays that this Court:

1.  Grant Plaintiff a trial by jury as to all triable issues in the above styled case;

2.  Award Plaintiff general and special damages on all Counts in an amount to be determined at trial;

3.  Award Plaintiff punitive damages;

4.  Award Plaintiff interest on any damages awarded;

5.  Award Plaintiff's attorneys' fees and costs associated with bringing this action;

6.  Award Plaintiff all interest to which he is legally entitled, including any pre-judgment and post-judgment interest; and

7.  Award Plaintiff such further relief as this Court deems proper.

Respectfully submitted this 30th day of June, 2023.

By: /s/ *Kara E. Phillips*

GILBERT H. DEITCH
Georgia Bar No. 216400
ANDREW T. ROGERS
Georgia Bar No. 007010
KARA E. PHILLIPS
Georgia Bar No. 379670
W. MICHAEL D'ANTIGNAC
Georgia Bar No. 205714
**DEITCH & ROGERS, LLC**
1189 S. Ponce de Leon Ave. NE
Atlanta, Georgia 30306
Tel: 770-394-9000
gil@victimattorneys.com
andy@victimattorneys.com
kara@victimattorneys.com
michael@victimattorneys.com

NAVEEN RAMACHANDRAPPA
Georgia Bar No. 422036
E. ALLEN PAGE
Georgia Bar No. 640163
**BONDURANT MIXSON**
**& ELMORE LLP**
1201 W. Peachtree Street NW
Suite 3900
Atlanta, Georgia 30309
Tel: 404-881-4100
ramachandrappa@bmelaw.com
page@bmelaw.com

DENNIS T. CATHEY
Georgia Bar No. 116600
MATTHEW A. CATHEY
Georgia Bar No. 532981
**CATHEY & STRAIN, LLC**
649 Irvin Street
Cornelia, Georgia 30531-3267
Tel: 706-408-8546
DCathey@catheyandstrain.com
MCathey@catheyandstrain.com

*Attorneys for Plaintiff*